## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GENE ERNY, derivatively on behalf of INDIA
GLOBALIZATION CAPITAL, INC.,
c/o Timothy Brown, Esq.
The Brown Law Firm, P.C.
240 Townsend Square
Oyster Bay, NY 11771

      Plaintiff,

      vs.

RAM MUKUNDA,
c/o India Globalization Capital, Inc.
4336 Montgomery Avenue
Bethesda, Montgomery County,
Maryland 20814,

CLAUDIA GRIMALDI,
c/o India Globalization Capital, Inc.
4336 Montgomery Avenue
Bethesda, Montgomery County,
Maryland 20814,

ROHIT GOEL,
c/o India Globalization Capital, Inc.
4336 Montgomery Avenue
Bethesda, Montgomery County,
Maryland 20814,

RICHARD PRINS,
c/o India Globalization Capital, Inc.
4336 Montgomery Avenue
Bethesda, Montgomery County,
Maryland 20814,

and

SUDHAKAR SHENOY,
c/o India Globalization Capital, Inc.
4336 Montgomery Avenue
Bethesda, Montgomery County,
Maryland 20814,

      Defendants,

C.A. No. _____

**DEMAND FOR JURY TRIAL**

and

INDIA GLOBALIZATION CAPITAL, INC.,
4336 Montgomery Avenue
Bethesda, Montgomery County,
Maryland 20814,

    Serve on:
    THE CORPORATION TRUST, Inc.
    2405 York Road, Suite 201
    Lutherville Timonium
    Maryland 21093-2264

    Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Gene Erny ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant India Globalization Capital, Inc. ("IGC" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Ram Mukunda, Claudia Grimaldi, Rohit Goel, Richard Prins, and Sudhakar Shenoy (collectively, the "Individual Defendants" and together with IGC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of IGC, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

IGC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by IGC's directors and officers starting on October 25, 2017 and continuing through the present (the "Relevant Period").

2.      IGC operates through two segments: Legacy Infrastructure and Alternative Therapies. Through Legacy Infrastructure, IGC engages in the trading of infrastructure commodities like steel and iron ore, and the rental of heavy equipment. The Company's Alternative Therapies segment focuses on the development and commercialization of cannabinoid-based combination therapies.

3.      The Company has been involved in infrastructure since its inception. The Company began targeting the cannabis industry in late 2013.

4.       As the Company admitted in its annual report filed with the SEC on Form 10-K on June 21, 2018, IGC's "main focus is to develop and commercialize cannabinoid based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain," and its lead product is Hyalolex, an oral therapy for treating symptoms associated with Alzheimer's disease.

5.      During the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements regarding the Company's business, including its cannabis-based products and use of blockchain technology.

6.      On October 2, 2018, Citron Research began tweeting about IGC, suggesting that the Company lacked any product and dubbing IGC "the poster child of a cannabis bubble."

7.      On October 3, 2018, the price of the Company's stock closed at $8.85, a decline of $4.15 or 31.9%, from its closing price on October 2, 2018.

8.      Before markets closed on October 4, 2018, *MarketWatch* published an article about IGC titled "All the potential red flags for investors in IGC, the pot stock that jumped 1,000% in three months." The article pointed the Company's history of pivots, history with the SEC, and issues with the Company's business partners, among other things, in support of its thesis that the Company's business was not as strong as investors had been led to believe.

9.      On this news, the price of IGC stock dropped 54.2% over the following two trading days. On October 4, 2018 the Company's stock closed at $6.41, down $2.44 per share, or 27.6% from the closing price on October 3, 2018. The price of IGC stock continued to fall the following day, closing at $4.05 on October 5, 2018, representing a 36.8% decline from their closing price on October 4, 2018.

10.      On October 29, 2018, one day after the *MarketWatch* article was republished, the NYSE announced in a press release that its staff had determined to commence proceedings to delist IGC's stock from the exchange, and trading of IGC shares on the NYSE was being suspended immediately. The reason for the NYSE's action, according to the NYSE's press release, was the Company's discontinuation of the business it was conducting at the time it was listed or admitted to trading in favor of ventures that "have not developed to a commercial stage or the success of which is problematical."

11.      On this news, the price of IGC stock dropped $1.93 per share, or ***77.5%*** from the closing price on October 29, 2018, to close at $0.56 per share on October 30, 2018 after trading on the over-the-counter market that day.

12.     The Company's stock now trades on the over-the-counter ("OTC") Markets – OTC Pink Tier, as announced by the Company in a Form 8-K filed with the SEC on November 13, 2018.

13.     Following that announcement, the price of IGC stock dropped $0.09 per share, or 8.3% from the closing price on November 13, 2018, to close at $0.99 per share on November 14, 2018. Thus, the price per share of the Company's stock fell *92.4%*, or $12.01, from its closing price on October 2, 2018, the day Citron began tweeting about the Company, by the close of trading on November 14, 2018.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

15.     Also during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company had substantially discontinued the business it was conducting at the time that it was initially listed on the New York Stock Exchange, and was instead engaged in ventures or promotions that had not been developed to a commercial stage or the success of which is problematical; (2) the Company adapted its business model frequently and radically in an attempt to lure investors seeking to capitalize on market fads, such as blockchain and cannabis; (3) the benefits of the Company's relationships with manufacturers, partners, and distributors were overstated in order to create a misleadingly positive impression of IGC's potential commercial success; (4) DaMa Pharmaceutical does not have a long  history of developing premier pharmaceutical products; (5) as a result of the foregoing, IGC's stock would be suspended from the New York Stock Exchange

and potentially delisted; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     In light of the Individual Defendants' misconduct, which has subjected IGC and its President and Chief Executive Officer ("CEO"), its Vice President and Principal Financial Officer ("PFO"), and its Principal Accounting Officer ("PAO") to being defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York; its President and CEO and its Vice President and PFO to being defendants in a federal securities fraud class action lawsuit pending in this District; and its President and CEO, Chairman of the Board and remaining independent director to being defendants in a separate federal securities fraud class action lawsuit pending in this District (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the CEO, PFO, PAO, and members of its Board's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the IGC Board of

Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the federal securities class actions based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because IGC is incorporated and headquartered in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of IGC. Plaintiff has continuously held IGC common stock at all relevant times. Plaintiff is a citizen of Florida.

**Nominal Defendant IGC**

25.     IGC is a Maryland corporation with its principal executive offices at 4336 Montgomery Ave., Bethesda, Maryland 20814. IGC's shares traded on the NYSE under the ticker symbol "IGC" up to and including October 29, 2018. Since that date, IGC's shares have traded on the OTC Markets under the ticker symbol "IGCC."

**Defendant Mukunda**

26.     Defendant Ram Mukunda ("Mukunda") has served as the Company's CEO, President, Executive Chairman, and Director since 2005. According to the Company's Schedule 14A filed with the SEC on July 7, 2018 (the "2018 Proxy Statement"), as of July 5, 2018, Defendant Mukunda beneficially owned 3,018,683 shares of the Company's common stock, which represented 9.1% of outstanding stock as of the date.[1] Given that the price per share of the Company's common stock at the close of trading on July 5, 2018 was $0.50, Mukunda owned over $1.5 million worth of IGC common stock.

27.     For the fiscal year ended March 31, 2018, Defendant Mukunda received $468,723 in compensation from the Company. This included $300,000 in salary, $148,198 in stock awards, and $20,525 in all other compensation.

28.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mukunda made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 7, 2017 | 70,000 | $  0.85 | $  59,500 |
| December 7, 2017 | 30,000 | $  0.86 | $  25,800 |
| December 8, 2017 | 9,950 | $  0.83 | $  8,259 |
| December 8, 2017 | 10,000 | $  0.84 | $  8,400 |

---

[1] This figure includes 592,689 shares of common stock that are owned by Defendant Mukunda's spouse for which Defendant Mukunda has no voting or financial rights

| December 8, 2017 | 10,000 | $ | 0.85 | $ | 8,500 |
| December 8, 2017 | 5,000 | $ | 0.88 | $ | 4,400 |
| December 8, 2017 | 15,000 | $ | 0.90 | $ | 13,500 |
| December 8, 2017 | 5,000 | $ | 0.91 | $ | 4,550 |
| December 14, 2017 | 25,000 | $ | 0.75 | $ | 18,750 |
| December 15, 2017 | 25,000 | $ | 0.76 | $ | 19,000 |
| January 10, 2018 | 7,738 | $ | 1.11 | $ | 8,589 |
| January 10, 2018 | 1,203 | $ | 1.08 | $ | 1,299 |
| January 10, 2018 | 3,059 | $ | 1.07 | $ | 3,273 |
| January 11, 2018 | 8,000 | $ | 1.12 | $ | 8,960 |
| January 11, 2018 | 4,000 | $ | 1.11 | $ | 4,440 |
| January 12, 2018 | 12,000 | $ | 1.05 | $ | 12,600 |
| August 22, 2018 | 50,000 | $ | 0.50 | $ | 25,105 |
| August 24, 2018 | 25,000 | $ | 0.64 | $ | 15,993 |
| August 28, 2018 | 125,000 | $ | 1.33 | $ | 166,000 |
| August 30, 2018 | 50,000 | $ | 1.87 | $ | 93,260 |

Thus, in total, before the fraud was exposed, he sold 490,950 Company shares on inside information, for which he received approximately $510,178. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

29.     The Company's 2018 Proxy Statement stated the following about Defendant Mukunda:

**Mr. Ram Mukunda**[2] has served as our CEO and in other capacities since April 29, 2005. Mr. Mukunda is responsible for general management and over the past five years has been largely responsible for the Company's strategy and positioning in the medical cannabis industry. He has been the chief-inventor and architect of all patent filings by the Company including the creation of the Company's lead product Hyalolextm [sic]. Prior to IGC, from January 1990 to May 2004, Mr. Mukunda served as Founder and CEO of Startec Global Communications, that he took public in 1997 on NASDAQ. Prior to Startec, he served as Strategic Planning Advisor at Intelsat, a communications satellite services provider and prior to that worked in the bond market for a boutique firm on Wall Street. Mr. Mukunda serves as an Emeritus member on the Board of Visitors at the University of Maryland, School of Engineering. From 2001 to 2003, he was a Council Member at Harvard's Kennedy School of Government, Belfer Center of Science and International Affairs. Mr. Mukunda is the recipient of several awards including, among others,

---

[2] Emphasis in original unless otherwise noted throughout.

the 2013 University of Maryland's International Alumnus of the year award, the 2001 Distinguished Engineering Alumnus Award, the 1998 Ernst & Young, LLP's Entrepreneur of the Year Award. He holds a B.S. degree in Electrical Engineering, a B.S degree in Mathematics, and a M.S. in Engineering from the University of Maryland. Mr. Mukunda has traveled extensively, and managed companies in Europe and Asia. He has more than 20 years of experience managing public companies and has acquired and integrated more than 20 companies. His in-depth business experience in the medical cannabis industry, his knowledge of U.S. capital markets, capital structuring, international joint ventures and broad science and engineering background make him well qualified to serve as a director of our company.

30.     Upon information and belief, Defendant Mukunda is a citizen of Maryland.

**Defendant Grimaldi**

31.     Defendant Claudia Grimaldi ("Grimaldi") has served as the Company's Vice President and PFO since May 9, 2018. According to the 2018 Proxy Statement, as of July 5, 2018, Defendant Grimaldi beneficially owned 644,007 shares of the Company's common stock, representing 1.9% of all outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on July 5, 2018 was $0.50, Grimaldi owned approximately $322,003 worth of IGC stock.

32.     For the fiscal year ended March 31, 2018, Defendant Grimaldi received $212,000 in compensation from the Company. This included $120,000 in salary and $92,000 in stock awards.

33.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Grimaldi made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| August 27, 2018 | 50,000 | $    1.10 | $      55,000 |
| August 30, 2018 | 116,020 | $    2.00 | $    232,040 |

Thus, in total, before the fraud was exposed, she sold 166,020 Company shares on inside information, for which she received approximately $287,040. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

34.     The Company's 2018 Proxy Statement stated the following about Defendant Grimaldi:

> **Ms. Claudia Grimaldi**, Vice-president and PFO, is responsible for coordinating the staff in various countries and ensuring timely and accurate statutory and regulatory compliance (SEC, FINRA, NYSE, IRS, XETRA 2, among others). She is also a Director of Cabaran Ultima in Malaysia and IGC Enterprises Limited in Hong Kong, as well as a Director for some others of our overseas subsidiaries.  Before assuming her current role in 2018, from 2013 to May 9, 2018, she served as the General Manager and prior to that from April 20, 2010 to 2013, she managed the office of the CEO.  Ms. Grimaldi graduated Summa Cum Laude from Javeriana University, a top five University in Colombia, with a Bachelor of Arts in Psychology. She holds an MBA in General Management, graduating with Highest Honors, from Meredith College, in North Carolina.  She is a member of Delta Mu Delta International Honor Society.  She is also fluent in both English and Spanish.

35.     Upon information and belief, Defendant Grimaldi is a citizen of Maryland.

**Defendant Goel**

36.     Defendant Rohit Goel ("Goel") has served as the Company's PAO since September 2017. According to the 2018 Proxy Statement, as of July 5, 2018, Defendant Goel beneficially owned 100,000 shares of the Company's common stock, representing 0.3% of all outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on July 5, 2018 was $0.50, Goel owned approximately $50,000 worth of IGC stock.

37.     For the fiscal year ended March 31, 2018, Defendant Goel received $41,000 in compensation from the Company in the form of stock awards.

38.     The Company's 2018 Proxy Statement stated the following about Defendant Goel:

**Mr. Rohit Goel** has been our Principal Accounting Officer (PAO) since September 2017.  As the Principal Accounting Officer, he is responsible for all accounting matters relating to the Company. His previous experience includes leading USGAAP audit teams and leading or assisting in the statutory audit of limited and private companies in various industries including telecom, stock brokerage, manufacturing, education, banking and digital marketing. He has worked on preparing process, workflow, implementation of SAP based accounting systems, worked on several accounting projects for clients based in US, Spain and UK, and assisted an audit team that conducted an asset audit for clients in Africa. In 2012 and 2013 he passed the CA CPT and CA IPCC exams. From September 2013 to March 2014 he worked as a Chartered Accountant (CA) trainee for Mahesh K Aggarwal & Co. [a]nd from April 2014 to September 11, 2016 he worked as a Chartered Accountant trainee, with AJSH & Co. In September 2016, he founded BnA Consultancy to provide accounting, taxation and statutory compliance services. In 2015, Mr. Goel graduated with a B. Com (honors) in Accounting and Tax (Commerce) from Delhi University, India, in 2015.  He is currently pursuing a Masters, in Commerce (Accounting) at IGNOU, India. Mr. Goel is based in India along with the rest of the accounting team.

39.     Upon information and belief, Defendant Goel is a citizen of India.

**Defendant Prins**

40.     Defendant Richard  Prins ("Prins") has served as a member of the Board since 2007, and as the Chairman of the Board and Chairman of Audit Committee since 2012. According to the 2018 Proxy Statement, as of July 5, 2018, Defendant Prins beneficially owned 418,000 shares of the Company's common stock, representing 1.3% of outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on July 5, 2018 was $0.50, Prins owned approximately $209,000 worth of IGC stock.

41.     For the fiscal year ended March 31, 2018, Defendant Prins received 150,000 shares of IGC common stock in compensation from the Company, in the form of stock awards.

42.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Prins made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 4, 2017 | 1,830 | $  0.56 | $    1,025 |
| December 4, 2017 | 23,170 | $  0.55 | $  12,744 |

Thus, in total, before the fraud was exposed, he sold 25,000 Company shares on inside information, for which he received approximately $13,768. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

43.     The Company's 2018 Proxy Statement stated the following about Defendant Prins:

**Mr. Richard Prins** has been our Chairman and Audit Committee Chairman since 2012 and has served as a Director since May 2007. Mr. Prins has extensive experience in private equity investing and investment banking. From March 1996 to 2008, he was the Director of Investment Banking at Ferris, Baker Watts, Incorporated (FBW).  Mr. Prins served in a consulting role to RBC until January 2009. Mr. Prins currently serves on several boards, volunteers full time with a non-profit organization, Advancing Native Missions, and is a private investor.  Since February 2003, he has been on the board of Amphastar Pharmaceuticals, Inc. From March 2010 until 2016, he was on the board of Hilbert Technologies. Mr. Prins holds a B.A. degree from Colgate University and an M.B.A. from Oral Roberts University.  Mr. Prins has substantial knowledge and experience with U.S. capital markets, has served on and chaired audit and compensation committees of boards, has extensive experience in finance, accounting, and internal controls over financial reporting.  His knowledge of the pharmaceutical industry and experience with U.S. capital markets make him well qualified to serve as a director of our company.

44.     Upon information and belief, Defendant Prins is a citizen of Virginia.

**Defendant Shenoy**

45.     Defendant Sudhakar Shenoy ("Shenoy") has served as a member of the Board since 2005, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of July 5, 2018, Defendant Shenoy beneficially owned 980,000 shares of the Company's common stock, representing 3.0% of outstanding shares as of that date. Given that the price per share of the

Company's common stock at the close of trading on July 5, 2018 was $0.50, Shenoy owned approximately $209,000 worth of IGC stock.

46.     For the fiscal year ended March 31, 2018, Defendant Shenoy received 150,000 shares of IGC common stock in compensation from the Company, in the form of stock awards.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Shenoy:

> **Mr. Sudhakar Shenoy** has been our Compensation Committee Chairman since 2012 and has served as a Director since the inception of IGC in May 2005. Mr. Shenoy is the Chairman and CEO of Reston, Virginia based Alyx Technologies, Inc., a business solutions and technology provider with operations in the United States and India. He was a member of the Non-Resident Indian Advisory Group that advised the former Prime Minister of India on strategies for attracting foreign direct investment. He was selected for the U.S. Presidential Trade and Development Mission to India in 1995. Mr. Shenoy was inducted into the Alumni Hall of Fame at the University of Connecticut School of Business and the School of Engineering. He was recognized as a Distinguished Alumnus of the Indian Institute of Technology (IIT) in Bombay, India in 1997. Shenoy has been named one of the Most Influential People in Washington, D.C. high tech industry as well as being awarded the 2004 Executive of the Year by the Northern Virginia Government Contractors Council. He holds a B. Tech (Hons.) in electrical engineering from the Indian Institute of Technology and an M.S. in Electrical Engineering and an M.B.A. from the University of Connecticut Schools of Engineering and Business Administration, respectively. Shenoy's extensive business contacts and his experience serving on the boards of public and private companies in the United States make him well qualified to serve as a director of our company.

48.     Upon information and belief, Defendant Shenoy is a citizen of Virginia.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors, and fiduciaries of IGC and because of their ability to control the business and corporate affairs of IGC, the Individual Defendants owed IGC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage IGC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in

furtherance of the best interests of IGC and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to IGC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of IGC, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of IGC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of IGC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised IGC's Board at all relevant times.

54. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and was, prior to October, 30, 2018, traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55. To discharge their duties, the officers and directors of IGC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of IGC were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland and the United States, and pursuant to IGC's own Code of Ethics for Directors, Officers, and Other Employees;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how IGC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of IGC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that IGC's operations would comply with all applicable laws and IGC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to IGC and the shareholders the duty of loyalty requiring that each favor IGC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of IGC and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with IGC, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by IGC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while three of the Individual Defendants engaged in insider trading.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who is a director of IGC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of IGC, and was at all times acting within the course and scope of such agency.

## IGC'S CODE OF ETHICS

65.     IGC's Code of Ethics for Directors, Officers, and other Employees (the "Code of Ethics") provides that "[i]t is the policy of India Globalization Capital, Inc. (IGC) to conduct its business with fairness, honesty, integrity, and consideration for others; to be honorable toward clients and employees; and to maintain its reputation as a concerned and responsible corporate citizen of the communities in which it conducts business."

66.     As its name implies, the "Code of Ethics applies to all of IGC's directors, officers and other employees."

67.     Regarding the duties of directors, officers, and employees with respect to the Code of Ethics, including reporting violations thereof, the Code of Ethics provides, in relevant part:

The directors, officers and other employees should note that simply complying with law or following common good business practices may not be enough to comply

with this Code of Ethics. It is therefore very important that the directors, officers and other employees read and understand this Code of Ethics.

If any director, officer or other employee has any question regarding this Code of Ethics, then that person should contact IGC's Corporate Counsel. Furthermore, *if any director, officer or other employee has information, concerns, or suspicions regarding any illegal or unethical conduct, then that person should immediately contact the Corporate Counsel.*

(Emphasis added.)

68.     The Code of Ethics provides it purpose is to "deter wrongdoing and promote":

(1) *Honest and ethical conduct*, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2) *Full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by IGC and in both IGC's public and internal communications*;

(3) Compliance with applicable governmental laws and regulations;

(4) *The prompt internal reporting of violations of this Code of Ethics* to an appropriate person or persons identified in this Code of Ethics; and

(5) Accountability for adherence to this Code of Ethics.

(Emphasis added.)

69.     The Code of Ethics provides, regarding financial reporting, that:

The directors, officers and employees must follow the accounting rules and controls set forth by the SEC and the Financial Accounting Standards Board. The directors, officers and other employees must also comply with the obligations set forth in the Sarbanes-Oxley Act of 2002.

*Each director, officer and other employee shall, when required, provide full, fair, accurate, timely, and understandable disclosure in the periodic reports that IGC is required to file*. Accordingly, all account books, budgets, project evaluations, expense accounts and other documents utilized in IGC's business must accurately report the matters to which they relate.

(Emphasis added.)

70.     The Code of Ethics provides, as to insider trading that:

*All directors, officers and employees must comply with all applicable securities laws regarding insider trading*. Per Section 406 of the Sarbanes-Oxley Act of

2002, it shall be unlawful for any director, officer or employee to, directly or indirectly, purchase, sell or otherwise acquire or transfer any IGC equity security during any pension fund or ESOP profit sharing plan blackout period.

(Emphasis added.)

71.     Regarding dealing with internal and external entities and stakeholders, the Code of

Ethics provides that:

> **The directors, officers and other employees must strive to apply high ethical, moral and legal principles in every aspect of their business dealings with their associates, the public, the business community, stockholders,** customers, suppliers **and governmental regulatory authorities**.

> All directors, officers and employees must avoid any activities that would involve IGC in any practice that is not in compliance with this Code of Ethics. Any director, officer or other employee who does not adhere to such standards and restrictions is acting outside the scope of his or her employment with IGC.

(Emphasis added.)

72.     The Code of Ethics provides, with respect to waivers and reporting violations

thereof, in relevant part, that:

> IGC will not excuse any violation of this Code of Ethics by a director, officer or other employee even if the violation was specifically requested or directed by any of their associates. Only the Board or the Corporate Audit Committee (CAC) can authorize a waiver of this Code of Ethics. See Section 3 of Part B of this Code of Ethics.

> **Each director, officer and other employee must alert the Board or the CAC, whenever an illegal, dishonest, or unethical act is discovered or suspected by any of their associates**. No director, officer or other employee will be penalized by IGC for reporting his or her discovery of such acts or for reporting suspicions of such acts provided that such director, officer or other employee is not a party to or responsible (alone or with others) for such acts.

(Emphasis added.)

73.     In violation of the Code of Ethics, the Individual Defendants conducted little, if

any, oversight of the Company's internal controls over public reporting and of the Company's

engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public and facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. Three

of the Individual Defendants violated the Code of Ethics by selling shares while in possession of

material, non-public information about the Company. Moreover, in violation of the Code of Ethics,

the Individual Defendants failed to maintain the accuracy of Company records and reports, comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report

violations of the Code of Ethics.

## IGC'S AUDIT COMMITTEE CHARTER

74.     The Company's has adopted an Audit Committee Charter, which provides that the

responsibilities of the Audit Committee include reviewing the Company's financial statements.

The Audit Committee Charter states, in relevant part:

> • *The Committee's review of the financial statements shall include*: (i) major
> issues regarding accounting principles and financial statement presentations,
> including any significant changes in the Company's selection or application of
> accounting principles, and *major issues as to the adequacy of the Company's
> internal control over financial reporting and any specific remedial actions
> adopted in light of significant deficiencies or material weaknesses*; (ii) discussions
> with management and the independent registered public accountants regarding
> significant financial reporting issues and judgments made in connection with the
> preparation of the financial statements and the reasonableness of those judgments,
> including analyses of the effects of alternative GAAP methods on the financial
> statements; (iii) consideration of the effect of regulatory and accounting initiatives,
> as well as off-balance sheet structures, on the financial statements; (iv)
> consideration of the judgment of both management and the independent registered
> public accountants about the quality, not just the acceptability of accounting
> principles; *and (v) the clarity of the disclosures in the financial statements*.

(Emphasis added.)

75.     The Audit Committee Charter provides that the responsibilities of the Audit

Committee regarding internal controls include the following:

> • *The Committee shall review management's report on its assessment of the
> effectiveness of internal control over financial reporting as of the end of each
> fiscal year* and the independent registered public accountants' report on (1)
> management's assessment and (2) the effectiveness of internal control over
> financial reporting.

*• The Committee shall discuss with management, the internal auditors, and the independent registered public accountants management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, including any significant deficiencies or material weaknesses identified*.

• The Committee shall discuss with the independent registered public accountants the characterization of deficiencies in internal control over financial reporting and any differences between management's assessment of the deficiencies and the independent registered public accountants'. The Committee shall also discuss with management its remediation plan to address internal control deficiencies. *The Committee shall determine that the disclosures describing any identified material weaknesses and management's remediation plans are clear and complete*.

• The Committee shall discuss with management its process for performing its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act.

• The Committee shall discuss with management, the internal auditors, and the independent registered public accountants any (1) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (2) any other changes in internal control over financial reporting that were considered for disclosure in the Company's periodic filings with the SEC.

(Emphasis added.)

76.     With respect to the Code of Ethics, the Audit Committee's responsibilities include the following:

• The Committee shall review the Company's compliance and ethics programs, including consideration of legal and regulatory requirements, and shall review with management its periodic evaluation of the effectiveness of such programs. The Committee shall review the Company's code of conduct and programs that management has established to monitor compliance with such code. The Committee shall receive any corporate attorneys' reports of evidence of a material violation of securities laws or breaches of fiduciary duty by the Company

77.     In violation of the Audit Committee Charter, Defendants Prins and Shenoy failed to, among other things, effectively review management's report on the effectiveness of the Company's internal controls over financial reporting and review the Company's compliance and ethics programs and the effectiveness thereof.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     Formed in 2005, IGC initially participated in various aspects of the infrastructure industry. These activities included heavy equipment rental and commodity trading.

79.     The Company pivoted to enter the cannabis industry in 2013. It has filed patent applications in the U.S. in connection with this line of business, including a 2018 application for the formulation of Hyalolex. Hyalolex is a supplement containing active compounds of the cannabis plant, as well as other active compounds, designed to treat symptoms of Alzheimer's disease.

80.     Cannabis has hundreds of active compounds, including cannabidiol ("CBD") and tetrahydrocannabinol ("THC"). Unlike THC, CBDs do not have a psychoactive effect, and therefore, do not produce a "high" or sense of euphoria associated with THC.

### False and Misleading Statements

81.     On October 25, 2017, the Company issued a press release announcing that it had entered into a memorandum of understanding with a German firm to import and distribute the Company's cannabinoid based therapies in Germany. The press release titled "IGC to Distribute its Formulations in Germany in Early 2018" stated, in relevant part:

> Bethesda, MD. October 25, 2017– India Globalization Capital, Inc. (NYSE American: IGC) announced that it ***has entered into a Memorandum of Understanding (MOU) with MediCann Handels GmbH, a company based in Hamburg Germany, for the import and distribution of IGC's cannabinoid based therapies including IGC-AD1 (Hyalolex) to pharmacies in Germany***.

> MediCann plans to distribute to pharmacies, apothecaries and other licensed retail outlets that are legally allowed to sell cannabinoid-based products. Under the current MOU, MediCann will provide the capital required for the transportation, import, storage, sales and marketing of products intended for the German market. The agreement is subject to standard closing conditions such as due diligence relating to satisfactory licensing and product procurement.

"There are many benefits to developing a strong presence in the German pharmacy market including, a favorable regulatory environment and reimbursement from health insurance providers. The agreement with MediCann is the first step in the commercialization process of our therapies, as we work out the logistics of how to efficiently deliver our products to Germany," states Ram Mukunda, CEO. "We are glad to add the products of IGC to our portfolio. With these products we will have a unique selling point in the German market," states Carsten Siegemund, CEO of MediCann.

82.     On November 17, 2017, the Company filed its quarterly report with the SEC for

the quarter ended September 30, 2017 on Form 10-Q (the "2017-2018 Q2 10-Q"). The 2017-2018

Q2 10-Q was signed by Defendants Mukunda and Goel.

83.     In relevant part, the 2017-2018 Q2 10-Q stated the following regarding the

Company's internal controls and procedures:

### Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO) and its principal financial and accounting officer (PFAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934. Based upon that evaluation, **our CEO and PFAO concluded that our disclosure controls and procedures are effective** to ensure that information required to be disclosed by the Company in reports under the Exchange Act is recorded, processed and reported within the time periods specified in the SEC rules and forms; and accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal controls over financial reporting during our fiscal quarter ended September 30, 2017 which were identified in conjunction with Management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Bold and italic subheadings in original. Bold emphasis added.)

84.     Attached to the 2017-2018 Q2 10-Q were certifications pursuant to Rule 13a-14(a)

and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX

Certifications") signed by Defendants Mukunda and Goel, attesting to the accuracy of the 2017-2018 Q2 10-Q.

85.     On December 7, 2018, the Company issued a press release titled "India Globalization Capital Launches New Corporate Websites Highlighting Canna-Pharmaceutical Compound Portfolio." The press release stated, in relevant part:

> Bethesda, December 7, 2017 (GLOBENEWSWIRE) -- India Globalization Capital, Inc. (NYSE American: IGC), today announced that it has **launched two new websites to detail the Company's cannabinoid pipeline for the indications of pain, seizures, eating disorders and Alzheimer's.** Investors are encouraged to visit www.igcpharma.com and www.Hyalolex.com for the latest information on IGC's initiatives and development timeline.

> *  *  *

> IGC's Alzheimer's drug candidate, IGC-AD1 (Hyalolex), works through a molecular pathway that allows low doses of IGC-AD1 to: 1) modulate Aβ protein production, 2) inhibit Aβ protein aggregation 3) reduce Tau phosphorylation, 4) enhance mitochondria function, and 5) help redirect the immune system, with none of the side effects commonly associated with cannabis. Based on these and other studies we expect to bring IGC-AD1 to market in early 2018, with the hope of bringing much needed relief to Alzheimer's patients.

> "Our initial focus on the canna-pharmaceutical front is on Alzheimer's, America's most expensive disease. In 2017, the direct cost of treatment for Alzheimer's and other dementias is projected to cost the U.S. approximately $259 billion. Roughly 5.3 million individuals in the U.S. alone suffer from the disease, and the number is expected to double over the next 20 years. As such, **we believe the market for Alzheimer's disease represents tremendous potential for our cannabis-extract-based compounds.** Our longer-term goal, based on adequate funding, is to move our Alzheimer's formulation through FDA registered pre-clinical and clinical trials. Independent of the FDA process, our near-term goal is to commercialize our liquid formulation for Alzheimer's as a Complimentary and Alternative Medicine (CAM) sold through licensed medical cannabis dispensaries in the U.S., and internationally in Canada and Germany," stated Ram Mukunda, CEO of IGC.

(Emphasis added.)

86.     On December 26, 2017, IGC issued another press release, this time asserting that the Company intended to use blockchain technology to address issues in the medical cannabis industry. This announcement came as the prices for cryptocurrencies, including Bitcoin and

Ethereum, were at or near all-time highs, and shortly after Bitcoin futures started trading. The press

release provided, in relevant part:

> **India Globalization Capital to use Blockchain to Address Issues Specific to the Medical Cannabis Industry**
>
> Bethesda, December 26, 2017 (GLOBENEWSWIRE) -- India Globalization Capital, Inc. (NYSE American: IGC), ***today announces that it will leverage its existing team of technology and healthcare experts to develop methods utilizing blockchain in areas such as product identification assurance (PIA)***. According to a recent study that was published in JAMA and detailed on www.pennmedicine.org, nearly 70% of all cannabidiol products sold online are either over or under labeled.
>
> "We understand the unique challenges facing the cannabis industry and believe that our team has the expertise to be the first to create meaningful solutions to address these issues using distributed ledgers inherent in blockchain technology. ***As we work to develop blockchain in the rollout of Hyalolex, our goal would be to establish a universal cannabis platform applicable to solving multiple industry challenges facing dispensaries and consumers. This would include addressing issues such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance,***" stated Ram Mukunda, CEO.

(Bold title in original, bold & italic emphasis added.)

87.     On January 2, 2018, the Company issued a press release titled "India Globalization

Capital Reports Promising Spatial Memory Results in Alzheimer's Study." That press release

quoted Defendant Mukunda as outlining the following key objectives for 2018:

> "We are preparing the groundwork necessary to get Hyalolex, our lead product formulation for Alzheimer's ready for Phase 2-B human trials. Independent of this, we expect to make the product available through medical dispensaries in select states of the U.S. In addition, ***we are working on addressing issues specific to the medical cannabis industry such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance (POA), using distributed ledgers inherent in blockchain technology***. We are ready for an exciting 2018," concluded Mr. Mukunda.

(Emphasis added.)

88.     On February 12, 2018, the Company issued a press release titled "India

Globalization Capital's CEO to Speak at CEO Healthcare Symposium in NY on February 12 &

13." That press release quoted Defendant Mukunda as outlining the following key objectives for

2018:

> "We are preparing the groundwork necessary to prepare Hyalolex, our lead product formulation for Alzheimer's ready for Phase 2-B human trials. Independent of this, we expect to make the product available through medical dispensaries in select states of the U.S. In addition, ***we are working on addressing issues specific to the medical cannabis industry such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance (POA), using distributed ledgers inherent in blockchain technology***. We look forward to an exciting 2018 and I wish to thank [even sponsor] YJP for the opportunity to speak at their CEO Healthcare Symposium alongside prestigious leaders and innovators in the healthcare industry," commented Ram Mukunda, CEO.

(Emphasis added.)

89.     On February 20, 2018, the Company filed its quarterly report with the SEC for the

quarter ended December 31, 2017 on Form 10-Q (the "2017-2018 Q3 10-Q"). The 2017-2018 Q3

10-Q was signed by Defendants Mukunda and Goel.

90.     In relevant part, the 2017-2018 Q3 10-Q stated the following regarding the

Company's internal controls and procedures:

> ***Evaluation of Disclosure Controls and Procedures***
>
> As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO) and its principal financial and accounting officer (PFAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934. Based upon that evaluation, **our CEO and PFAO concluded that our disclosure controls and procedures are effective** to ensure that information required to be disclosed by the Company in reports under the Exchange Act is recorded, processed and reported within the time periods specified in the SEC rules and forms; and accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.
>
> ***Changes in Internal Control over Financial Reporting***
>
> There were no changes in our internal controls over financial reporting during our fiscal quarter ended December 31, 2017 which were identified in conjunction with Management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15

under the Exchange Act that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting

(Bold and italic subheadings in original. Bold emphasis added.)

91.    Attached to the 2017-2018 Q3 10-Q were SOX certifications signed by Defendants Mukunda and Goel attesting to its accuracy.

92.    On March 26, 2018, the Company issued a press release announcing that Hyalolex would be hitting the shelves in Puerto Rico starting in April 2018. The press release stated, in relevant part:

Alzheimer's patients in Puerto Rico will be the first in the United States to obtain Hyalolex, IGC's proprietary cannabinoid based formulation aimed at relieving many of the symptoms of Alzheimer's Disease, such as agitation, anxiety, sleep disorder, as well as caregiver distress, among others. Pursuant to an agreement between IGC and DaMa Pharmaceutical and its affiliates, Hyalolex will be on the shelves in April, and available to patients in ten of Puerto Rico's 30 dispensaries, including the two premier dispensaries in San Juan, the largest city in Puerto Rico. Under the licensing terms DaMa will help produce Hyalolex in Puerto Rico, and market Hyalolex to medical dispensaries and end users. Hyalolex will be prescribed as a liquid supplement in twice-daily doses for mild to moderate Alzheimer patients, and thrice-daily doses for moderate to advanced patients.

93.    The press release continued, stating:

"***We are very pleased to work with the DaMa Pharmaceutical team to bring Hyalolex to Puerto Rico, which has a long history of developing premier pharmaceutical products***," said Ram Mukunda CEO of IGC. He noted that the Puerto Rican government has been a supporter of a comprehensive medical cannabis program. "We are proud to be a contributor to Puerto Rico's economic development and to the wellbeing of its Alzheimer's patients", he said. According to alz.org, Hispanics are approximately one and one-half times as likely to have Alzheimer's as non-Hispanic whites.

"This is a decisive step in delivering our cannabis intellectual property to patients, after many years of development. It is particularly important as part of our effort to establish a distribution network to productize our IP," Mukunda said.

This partnership represents a significant opportunity to provide those afflicted with Alzheimer's with potential relief from a very difficult diagnosis and ease the burden of their caregivers who attend to them. It also represents a significant opportunity to collect data on Hyalolex's performance within a diverse patient set", said Mukunda. ***IGC will deploy a QR code-based product assurance, information***

*dissemination, and data collection system as a step towards a more robust block
chain-based product assurance system*.

(Emphasis added.)

94.     On June 21, 2018, the Company issued a press release announcing its financial

results for the fiscal year ended March 31, 2018. With respect to the Company's purported use of

blockchain technology, that press release stated, in relevant part:

> The Company has developed and deployed a QR code-based system that allows
> patients to access a website with specific information on Hyalolex. Each QR code
> is specific to a state and displays information specific to that state. We are in the
> process of creating a mobile optimized version that will expand the product
> information available to patients to include location of dispensaries that carry our
> products, based on zip code, and in turn also allow us to gather information through
> surveys and obtain feedback from patients.
>
> *As the number of states in which the product is available increases, we expect to
> expand the backend to a blockchain that allows for inputs directly from growers,
> processors, and dispensaries*. This information will collectively display product
> identification, and product origination, by providing the patient with information
> regarding the origin, chemicals, and processes used to manufacture the product. We
> expect to expand the QR code-based system in several phases over fiscal 2019.

(Emphasis added.)

95.     Also on June 21, 2018, the Company filed its Form 10-K with the SEC for the fiscal

year ended March 31, 2018 (the "2017-2018 10-K"). The 2017-2018 10-K was signed by

Defendants Mukunda, Grimaldi, Goel, Prins, and Shenoy.

96.     The 2017-2018 10-K asserted that the Company operates in two business segments,

Legacy infrastructure and alternative therapies. Regarding the Company's legacy infrastructure

business, the 2017-2018 10-K stated, in relevant part:

> *Since our inception, we have participated in various aspects of the infrastructure
> industry.  During the fiscal year 2018, we streamlined our legacy infrastructure
> business to infrastructure commodity trading, and heavy equipment rental*.  We
> trade infrastructure commodities like steel and iron ore, among others, and we rent
> heavy equipment. Our subsidiary, Techni Bharathi Private Ltd ("TBL") in India is
> responsible for heavy equipment rental, and its subsidiary IGC Enterprises Ltd. in
> Hong Kong is responsible for infrastructure trading.

For the rental business, we supply equipment and operators to construction companies. This business is very small and limited to the city of Kochi in Kerala, India.  In fiscal year 2018 we have three customers all of which are construction companies.  For the trading business we have four customers and no principal supplier.  We are opportunistic and will buy from any of the South Asian countries.  In fiscal 2018 our suppliers are companies based in India and Hong Kong.  For the level of business and the value of each trade, the number of customers we have is adequate and does not constitute inordinate customer risk.  Revenue from our legacy infrastructure business including heavy equipment rental and commodity trading is less than 1% based on revenue of both the rental and trading markets.  This business is highly competitive, and our differentiation is based primarily on price and industry knowledge of commodity requirements for infrastructure projects.  Our strategy in fiscal 2019 for the legacy business is to maintain annual revenue of $3-$5 million and focus on growing margin by reducing the cost of money and by modest investments in heavy equipment.

(Emphasis added.)

97.     The 2017-2018 10-K continued, stating:

The pricing for steel and iron ore are heavily influenced by tariffs and demand for infrastructure development.  In fiscal year 2018, steel prices although down from fiscal 2017, fluctuated in a relatively narrow band as did iron ore prices.  We do not hedge or take long term positions on commodities.  We limit our exposure by contractually ensuring that every purchase has a vetted legitimate buyer and ensuring rapid closing of transactions.  On a transaction basis, this business does not require special government approvals.  We have the requisite business licenses that allow us to operate in this segment.

In the fiscal years ending March 31, 2018 and 2017, we funded our subsidiary TBL $75,000 and $43,000 for working capital, respectively.  For the trading business our sales team is in Hong Kong and the sales cycle lasts between two and three months.  For our equipment leasing business our sales team is in Kochi, India, where the sales cycle lasts around two months.  In Malaysia, through our subsidiary Cabaran Ultima, we operated a real estate management business.  During the fiscal year 2018, we decided to exit this business and as of March 31, 2018, we have accounted for our investment in Cabaran Ultima as "Investment Held for Sale" at a fair value of $147,500.  We hope to sell Cabaran Ultima during fiscal year 2019.  Please see Note-22, "Investment Held for Sale" for more information.

98.     Regarding the Company's alternative therapies segment, the 2017-2018 10-K

stated, in relevant part:

**_We focus on the development and commercialization of cannabinoid-based combination therapies_**.  Cannabinoids are chemical compounds that exert a range of effects on the body, including impacting the immune response, gastrointestinal

maintenance and motility, muscle functioning, and nervous system response and functioning. Phytocannabinoids are cannabinoids that occur naturally in the cannabis plant. Phytocannabinoids are abundant in the viscous resin produced by glandular structures called trichomes. There are over 480 different compounds in the cannabis plant. Many of them have been identified as cannabinoids. Of these, THC (delta-9-tetrahydrocannabinol) is the main psychoactive component in the plant with many therapeutic uses. The other broadly pursued non-psychoactive phytocannabinoid, CBD (Cannabidiol), is pleiotropic influencing many pathways in humans, dogs, and cats, and may be used to provide relief to a variety of symptoms including pain, seizures, and eating disorders. In medical applications, cannabinoids are extracted from the cannabis plant using a variety of well-established technologies, including using $CO2$, butane, alcohol, among others, as solvents. The refined extracted material is isolated for specific active ingredients like THC and CBD, among others, and used in formulations as the primary or secondary active ingredient.

Our work and strategy are to use cannabinoids synergistically with other active ingredients that in many cases have been established to treat specific conditions. We seek, through the synergies for our combination therapies, to decrease side effects, increase bio-availability, and enhanced efficacy. This strategy in some cases leads to "new and improved" products, and in others it results in totally novel products with surprising results, as in the case of Hyalolex[tm].

We have filed eight provisional patents with the United States Patent and Trademark Office ("USPTO"), in the phytocannabinoid-based combination therapy space, for the indications of pain, medical refractory epilepsy, and cachexia. In addition, in May 2017, we acquired an exclusive license to a patent filed by the University of South Florida Research Foundation entitled "Cannabidiol and Synthetic Dronabinol for treatment of Alzheimer's Disease."

(Emphasis added.)

99.     Regarding the Company's marketing plan for Hyalolex, the 2017-2018 10-K stated,

in relevant part:

As the final product contains a controlled substance, although in micro-doses, it can only be manufactured by a state licensed entity that conforms to all relevant state regulations. The reseller will have the product manufactured and delivered to state licensed dispensaries where they can be sold consistent with state laws governing the sale of products containing cannabinoids. The product will only be available to patients in medical states that are registered through specific state sanctioned programs. To ensure compliance and product assurance we are developing a QR code (Quick Response code) supported system that will track the product and allow patients to access information about the product and also provide feedback. To this,

> ***we plan to add a backend based on blockchain technology that will go much
> further in ensuring compliance, product authenticity and product origin***.

(Emphasis added.)

100.    The 2017-2018 10-K asserted that the Company possessed a "Competitive

Advantage," stating, in relevant part:

> We believe that there are three factors coalescing to create entrepreneurial
> opportunities in the cannaceutical industry. The first is deregulation of the industry.
> This is taking place in the U.S., Canada, Germany, and other parts of the world. We
> believe that during any major deregulation, it takes several years for market
> equilibrium to be achieved.  Most large companies don't react quickly and that
> creates entrepreneurial opportunities, including as a first mover. The second factor
> is that the plant has cannabinoids that work on several pathways, in humans and
> animals, and that these cannabinoids can potentially be used to treat many diseases
> and aliments. The third factor is a rising awareness and demand for natural products
> including natural complementary and alternative medicines.

101.    The 2017-2018 10-K stated, regarding the Company's disclosure controls, that:

> As of the end of the period covered by this report, management conducted an
> evaluation, under the supervision and with the participation of its Chief Executive
> Officer (CEO) and its principal accounting officer (PAO), of the effectiveness of
> the design and operation of our disclosure controls and procedures pursuant to
> Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934.  Based upon that
> evaluation, ***our CEO and PAO concluded that our disclosure controls and
> procedures are effective***.

> Disclosure controls and procedures are defined by Rules 13a-15(e) and 15d-15(e)
> of the Exchange Act as controls and other procedures that are designed to ensure
> that information required to be disclosed by us in reports filed with the SEC under
> the Exchange Act is recorded, processed, summarized and reported within the time
> periods specified in the SEC's rules and forms.  Disclosure controls and procedures
> include, without limitation, controls and procedures designed to ensure that
> information required to be disclosed by us in reports filed under the Exchange Act
> is accumulated and communicated to our management, including our CEO and
> PAO, or persons performing similar functions, as appropriate, to allow timely
> decisions regarding required disclosure.

(Emphasis added.)

102.    Regarding the Company's Code of Ethics, the 2017-2018 10-K asserted, in relevant

part:

A code of business conduct and ethics is a written standard designed to deter wrongdoing and to promote (a) honest and ethical conduct, (b) full, fair, accurate, timely and understandable disclosure in regulatory filings and public statements, (c) compliance with applicable laws, rules and regulations, (d) the prompt reporting violation of the code and (e) accountability for adherence to the code. The Company has adopted a written code of ethics (the "Code of Ethics") that applies to the Company's Chief Executive Officer and senior financial officers, including the Company's Principal Accounting Officer, Controller, and persons performing similar functions (collectively, the "Senior Financial Officers"), in accordance with applicable federal securities laws and the rules of the NYSE American, and to all employees. Investors may view our Code of Ethics on the corporate governance subsection of the investor relations portion of our website at www.igcpharma.com.

103.    Attached to the 2017-2018 10-K were SOX certifications signed by Defendants Mukunda, Grimaldi, and Goel, attesting to the accuracy of the 2017-2018 10-K.

104.    On July 6, 2018, the Company issued the 2018 Proxy Statement. Defendants Mukunda, Prins, and Shenoy solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

105.    The 2018 Proxy Statement stated, regarding the Company's Code of Ethics, that:

A code of business conduct and ethics is a written standard designed to deter wrongdoing and to promote (a) honest and ethical conduct, (b) full, fair, accurate, timely and understandable disclosure in regulatory filings and public statements, (c) compliance with applicable laws, rules and regulations, (d) the prompt reporting violation of the code and (e) accountability for adherence to the code. The Company has adopted a written code of ethics (the "Senior Financial Officer Code of Ethics") that applies to the Company's Chief Executive Officer and senior financial officers, including the Company's Principal Accounting Officer, Controller and persons performing similar functions (collectively, the "Senior Financial Officers") in accordance with applicable federal securities laws and the rules of the NYSE American. Investors may view our Senior Financial Officer Code of Ethics on the corporate governance subsection of the investor relations portion of our website at www.igcinc.us.

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

106.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as multiple Individual Defendants allowed false and misleading statements to be issued to the investing public, and three of the Individual Defendants engaged in insider trading during the Relevant Period for combined proceeds of approximately $810,985.

107.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to align "executive performance with company growth and stockholder value," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

108.    The 2018 Proxy Statement also failed to disclose that: (1) the Company had substantially discontinued the business it was conducting at the time that it was initially listed on the New York Stock Exchange, and was instead engaged in ventures or promotions that had not been developed to a commercial stage or the success of which is problematical; (2) the Company adapted its business model frequently and radically in an attempt to lure investors seeking to capitalize on market fads, such as blockchain and cannabis; (3) the benefits of the Company's relationships with manufacturers, partners, and distributors were overstated in order to create a misleadingly positive impression of IGC's potential commercial success; (4) DaMa Pharmaceutical does not have a long  history of developing premier pharmaceutical products; (5) as a result of the foregoing, IGC's stock would be suspended from the New York Stock Exchange and potentially delisted; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

109.    On July 10, 2018, the Company issued a press release announcing its 2018 Annual Meeting of Stockholders. The press release included an annual letter to shareholders from Defendant Mukunda. Defendant Mukunda's letter stated, in relevant part:

> Our flagship product is a first in the cannabis industry and is based on years of research that resulted in a patent filing, which we acquired from the University of South Florida. The liquid formulation, Hyalolex, that we have tagged as 'drops of clarity' is novel and studies show that its active ingredients can potentially help alleviate symptoms and lead to better management of Alzheimer's patients. Worldwide, about 44 million people suffer from Alzheimer's that is responsible for 70-80% of all dementia, and there is no cure. Our strategy for the next year is to license Hyalolex, state by state, for sale in legal dispensaries as a complementary medicine. We expect to first focus on the East Coast followed by the West Coast and then Canada.
>
> In 2018 we worked on a QR-code based product assurance, information dissemination, and data collection system. In 2019 we expect to create a mobile optimized version that will expand the product information available to patients to include location of dispensaries that carry our products, based on zip code, while simultaneously allowing us to gather valuable data and feedback through patient's surveys. ***The blockchain based backend will allow for inputs directly from growers, processors, and dispensaries. This information will collectively display product identification, and product origination, by providing the patient with specific details regarding the origin, chemicals, and processes used to manufacture the product. We expect this to be another industry first.***
>
> ***Over the past 4 years we have spent our energy in the medical cannabis industry that has culminated in the development of a flagship product, which we are in the final stages of launching***.

(Emphasis added.)

110.    On August 6, 2018, the Company issued a press release announcing the results of its 2018 Annual Stockholders' meeting. The press release stated, in relevant part:

**Hyalolex Initiatives / Drops of Clarity Program**

Alzheimer's disease (AD) is a form of dementia. It is known as America's most expensive disease, with an estimated cost to the U.S. economy of $236 billion. AD currently affects more than 5.3 million Americans and over 65% of AD patients are women.

We are pleased to launch our first marketing and branding campaign, titled 'Drops of Clarity' in support of Hyalolex, our product whose active ingredients have been shown to be beneficial for patients suffering from tested on [sic] Alzheimer's.

Our program will highlight the potential benefits of Hyalolex as a supplement to authorized cannabis physicians as well as to caregivers and patients via both a digital format and through grassroots outreach. We expect to utilize this methodology, in conjunction with licensing arrangements with manufacturers, to expand our reach into multiple U.S. markets and Canada.

### Blockchain Initiatives / Product Labeling, Identification and Origin Assurance

The Company is focused on the development of a QR code-based system that allows patients to access a website with information on our alternative medicine products, specific per state. ***As the number of states in which the product is available increases, we expect to expand the backend to a blockchain that allows for inputs directly from growers, processors, and dispensaries. This information will collectively display product identification and product origination by providing the patient with information regarding the origin, chemicals, and processes used to manufacture the product***. We expect to expand the QR code-based system in several phases over fiscal 2019.

(Bold subheadings in original. Bold & italic emphasis added.)

111.    On October 16, 2018, the Company filed its quarterly report with the SEC for the quarter ended September 30, 2018 on Form 10-Q (the "2018-2019 Q2 10-Q"), signed by Defendants Mukunda and Grimaldi.

112.    In relevant part, the 2018-2019 Q2 10-Q stated the following regarding the Company's internal controls and procedures:

### *Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO), its principal financial officer (PFO) and its principal accounting officer (PAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934. In designing and evaluating the disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that our management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based upon that evaluation, our CEO, PFO and PAO concluded that our disclosure controls and procedures were designed a reasonable assurance level and were effective to reasonably ensure that information we are required to disclosed [sic] in reports under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and that such information is accumulated and communicated to the Company's management, including its principal executive officer, principal financial officer and principal accounting officer, as appropriate, to allow timely decisions regarding required disclosures.

### *Changes in Internal Control over Financial Reporting*

There were no changes in our internal controls over financial reporting during our fiscal quarter ended September 30, 2018, which were identified in conjunction with Management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Bold and italic subheadings in original. Bold emphasis added.)

113.    Attached to the 2018-2019 Q2 10-Q were SOX certifications signed by Defendants Mukunda and Grimaldi attesting to its accuracy.

114.    On September 25, 2018, IGC issued a press release titled "IGC to Enter the Hemp/CBD-Infused Energy Drink Space." This announcement, which involved rights to market products in the Americas came just weeks before the day recreational marijuana became legal for sale in Canada (October 17, 2018).  The press release stated, in relevant part:

BETHESDA, MD. September 25, 2018 / India Globalization Capital, Inc. (NYSE AMERICAN: IGC) announces today that it has executed a distribution and partnership agreement for several products including a sugar free, energy drink called 'Nitro G'.

IGC will pay 797,000 shares of restricted, unregistered, common stock, for a 10-year agreement, with an option for multiple 5-year extensions, *for the rights to market the products in the U.S., Canada, Mexico and South America and exclusive global rights to all developed CBD-infused product*s.

IGC plans to create a branded, hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD.

(Emphasis added.)

115.    The press release continued, quoting Defendant Mukunda:

"According to a Grand View Research forecast, the global energy drinks market is projected to be almost $85 billion by the year 2025, with non-alcoholic beverage sales expected to account for a significant portion of the market. This represents a unique opportunity for the development and commercialization of a CBD-infused, sugar free energy beverage," stated Ram Mukunda, CEO of IGC.

"***By combining the experience of IGC with Hyalolex with the manufacturer in Malaysia***, we potentially bring together unique expertise in microencapsulation, solubility, infusion, controlled dose delivery, and sugar free processes, among others. ***This will help introduce an exciting CBD-infused energy drink to the market and the acquired knowledge base can be further leveraged to diversify the delivery method for IGC branded products including Hyalolex™, our flagship product for patients suffering from Alzheimer's***," continued Mukunda.

This transaction is particularly timely given the language of the 2018 Farm Bill that currently addresses potentially legalizing, on a federal level, industrial hemp and products derived from it, including hemp oil that contains CBD.

(Emphasis added.)

116.    The statements referenced in ¶¶ 81-103 and 109-115 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company had substantially discontinued the business it was conducting at the time that it was initially listed on the New York Stock Exchange, and was instead engaged in ventures or promotions that had not been developed to a commercial stage or the success of which is problematical; (2) the Company adapted its business model frequently and radically in an attempt to lure investors seeking to capitalize on market fads, such as blockchain and cannabis; (3) the benefits of the Company's relationships with manufacturers, partners, and distributors were overstated in order to create a misleadingly positive impression of IGC's potential commercial success; (4) DaMa Pharmaceutical does not have a long  history of developing premier pharmaceutical products; (5) as a result of the foregoing, IGC's stock would be suspended from the New York Stock Exchange and potentially delisted; (6) the Company failed to maintain

internal controls; and (7) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

117.    On October 2, 2018, Citron Research began tweeting about IGC, asserting that the Company had "No product," and was "All hype." Citron Research's 11:08 AM tweet asserted: "This hype stock is the poster child of a cannabis bubble. Always cautious but nothing but air. Could write pages about this scheme."

118.    In a second tweet, posted just ten minutes later, Citron Research asserted:

> . . . $IGC has raised money 3 times in 3 weeks at an average price of $3.31. At least the company is honest about the absurd move[.] The stock should have a skull and crossbones at Fidelity. Just praying for more borrow to open up. Target price - $6 fast

119.    The Company's stock closed at a high of $13.00 on October 2, 2018. The following day, the price of the Company's stock closed at $8.85, a decline of $4.15 or 31.9%.

120.    Before markets closed on October 4, 2018, *MarketWatch* published an article about IGC titled "All the potential red flags for investors in IGC, the pot stock that jumped 1,000% in three months."[4] The article's byline stated that "[t]he stock has rocketed since the company announced it planned a line of CBD-infused drinks, but details remain scant."

121.    The article began with a discussion of IGC's entry into the CBD product market, stating, in relevant part:

> A review of the company's [] history and regulatory filings has uncovered an alarming number of red flags that undermine some of the claims made by the company and demonstrate the importance of due diligence when investing.

---

[4] Originally published on October 4, 2018, the article was republished on October 28, 2018. The material quoted herein is drawn from the republished October 28, 2018 version.

The stock's move came after the company announced its plan for a line of CBD-infused drinks, or those containing cannabinoids, ingredients in cannabis that are said to have health benefits. With Canada gearing up for full legalization of cannabis for adult recreational use on Oct. 17, the sector has become a hot market for speculators, with investors jumping on every announcement of a planned product, alliance, distribution agreement or deal.

IGC has benefited — its market capitalization has ballooned to $295 million on Thursday from just $78 million on Sept. 25, the day before the drinks announcement.

122.    The article then discussed the situation at IGC, stating, in relevant part:

In its most recent quarterly earnings report, IGC posted a loss of $512,296 on revenue of $1.5 million for the three months [] end[ed] June[ 30, 2018]. Cost of revenue came to $1.4 million, while SG&A costs came to $553,645, which exceed its revenue.

MarketWatch has spent several days calling and emailing IGC, its executives and the scientists whom it names as advisers on its website. Founder and Chief Executive Ram Mukunda returned a call on Wednesday, before asking for time to read the questions we had emailed him with the promise he would call back. On Thursday, the company said it would provide answers to our questions. It has not done so at this time.

123.    The article then began outlining ten potential red flags at IGC, beginning with the

Company's claims that it would manufacture a CBD beverage in Malaysia. The article stated, in

relevant part:

**Made in Malaysia?**

In the release announcing the plan for CBD-infused drinks, ***IGC indicates it will work with a manufacturer in Malaysia, but that country has a mandatory death sentence for cannabis possession and has no medical-marijuana program***.

"***Marijuana or any form of products including CBD oil is illegal in Malaysia***," Erny Sabrina Mohd Noor, counselor for agriculture at the Malaysian Embassy in Washington, D.C., told MarketWatch.

(Bold heading in original. Emphasis added in bold & italics.)

124.    The article then continued, discussing IGC's "history of pivots," beginning with a

brief history of IGC:

> **IGC**, which started life in 2005 as a blank-check company, **has a history of pivoting to new businesses as they become popular and releasing press releases to highlight those business-plan shifts**.
>
> The company's IPO prospectus said that it aimed to acquire or merge with businesses operating in India, to take advantage of the potential of that market. In 2007, it began to acquire infrastructure assets in Asia and later started trading commodities such as steel and iron ore, leasing heavy construction equipment and managing real estate in Malaysia, according to its website. Today, the SEC-registered area of business is described as "wholesale electronic parts and equipment."
>
> In 2013, the company started to look into the cannabis industry, where it now claims to be working on treatments for serious diseases including Alzheimer's and Parkinson's, as well as anxiety and sleep disorders.
>
> However, **a review of its regulatory filings reveals that it has assigned very little funding to research and development — roughly $150,000 a year — and none to clinical studies or any of the other steps needed to win U.S. Food and Drug Administration approval**.

(Emphasis added.)

125.    The article continued discussing the Company's history of pivots, accompanied by

the following illustrative graph:

> **A look at press releases from the last year shows a clear pattern of repeatedly entering the latest hot market**. In late 2017, that was blockchain, while last month it was cannabis that helped push or support the stock above the $1 threshold. The latest announcement appeared to be timed with a sale of shares.



FactSe

The strategy-pivot approach to capturing investor interest was used most dramatically by Long Island Iced Tea Corp., which caused a stir on Dec. 21, 2017, by announcing it was changing its name to Long Blockchain Corp. LBCC, -8.02% , sending the stock up 183%. The news came three days after bitcoin futures US:XBTV8 started trading, at prices above $20,000.

Less than a week later, ***IGC followed with its own blockchain initiative, saying it would use the technology to address "issues" in areas such as product identification. The stock shot up 91% to $1.26 on Dec. 26, the first close above the $1 mark since July 2014***.

(Emphasis added.)

126.    The article then discussed the Company's stock offerings, and market reactions to

announcements involving the launch of CBD based products, stating, in relevant part:

On Dec. 29, a proposal to approve the grant of 1.9 million shares of stock to "current and new employees, advisers, directors and consultants by the board of directors" passed a shareholder vote.

In mid-September, Level Brands Inc.'s stock [] more than doubled in four days, just before the company announced on Sept. 21 the online launch of five new cannabidiol (CBD) products under the Kathy Ireland Health & Wellness brand. The

stock ran up as much 24% during the day of the announcement, before reversing course to close the session down 12%.

Four days later, ***IGC said it was entering the market for CBD-infused energy drinks, with "plans to create a branded hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD." In other words, the product, called "Nitro-G," was still in the planning stages. Still, the news helped kick off a near sixfold rise — the stock ran up 458% — over the next five sessions.***

On cue, the company disclosed late Tuesday it had completed its at-the-market offering of 5.65 million shares at a weighted average price of $5.30, which was more than double the closing price of $2.33 on Sept. 25, when the offering commenced. Coincidentally, Sept. 25 was the day IGC said it was entering the market for CBD-infused energy drinks.

The stock tumbled 32% in afternoon trade Friday, putting it on track for the biggest one-day selloff since going public in April 2006. It has plummeted 66% the past three sessions.

(Emphasis added.)

127.    The article continued, discussing the Company's history with the SEC. This section

began with a second lesson on IGC's history:

IGC went public on May 13, 2005, led by Ram Mukunda, who has since served as chairman of the board, CEO and president. Mukunda was previously founder and CEO of a company called Startec Global Communications, according to a biography on his company website. The bio fails to disclose that Startec went bankrupt in 2001, having defaulted on a $9.6 million interest payment.

IGC started in 2005 with $200,000 in assets, a $100,000 loan payable to Mukunda and an obligation to pay Mukunda's company, Integrated Global Network LLC, an administrative fee of $7,500 a month for office space and general and administrative services. John Cherin, an Arthur Andersen alumnus, served as chief financial officer until he was replaced by Rohit Goel and Shajy Mathilakathu as co-principal accounting officers on Sept. 29, 2017.

Claudia Grimaldi became the company's "principal financial officer" in May 2018.

128.    The article continued, discussing the Company's history of correspondence, and

delinquent filings, with the SEC:

*The company has attracted a lot correspondence from the SEC*. In March 2017, the SEC wrote to ask about a 2009 transaction with Bricoleur Capital Management, an investment adviser. The loan from Bricoleur to IGC has been renegotiated several times.

IGC's financial statements filed with the SEC as of June 30, 2017, said the company had issued 90,000 shares valued at $36,600 to Bricoleur Partners L.P. against the outstanding $1.8 million promissory note as repayment of interest. Bricoleur's SEC registration was terminated in December 2012, and its license was revoked by the state of Florida in 2015.

*IGC has received nine late-filing notices from the New York Stock Exchange in just the past three years, prompting the SEC to ask over and over when it is going to comply with the rules*.[5] IGC received another notice of delisting from the NYSE in October 2017 and had to ask the SEC for an extension to file and hold a shareholder meeting. The company had still not held a shareholder meeting by December 2017, and it got another notice from the SEC asking when it would comply with its exchange's rules.

The company finally caught up on its filings, averting a NYSE delisting by issuing its annual report and 10K on June 21 and holding a shareholders meeting on August 6.

An SEC spokeswoman declined comment on the company.

(Emphasis added.)

129.    The article then discussed the Company's ownership, pointing out that the

Company's officers and directors own a significant amount of the Company's stock:

*The biggest beneficiaries of the news that's pumped up the stock are IGC's executive officers*, as the following table shows:

---

[5] An updated version of this article published on November 23, 2018 contained the following correction: "*An earlier version of this article incorrectly said the NYSE had issued nine late-filing notices to IGC in the past three years. The company itself told the SEC nine times since 2015 that it could not file its quarterly report on time.*"



*Six of the top seven shareholders, who own a combined 16.5% of all shares outstanding, are IGC's six executive officers and directors, as named in the company's latest annual report filing.*

Of the rest of the outstanding shares, 0.9% is owned by institutional investors and 82.6% is owned by "unknown" investors, which, according to FactSet, can include individual investors, mutual funds not covered because of nondisclosure laws, institutional managers managing less than $100 million and foreign-based institutional investors.

The sole institutional investor in the top seven is hedge fund Citadel Advisors LLC, which owned about 115,000 shares as of June 30, or 0.3% of the shares outstanding, according to the most recent 13F filing with the SEC. That's down from about 149,000 shares as of the end of May, and up from zero shares at the end of 2017.

(Emphasis added.)

130.    The article then discussed issues with the Company's business partners, beginning

with DaMa Pharma:

*The Dama Pharma company in Puerto Rico appears to have been created just in time for an IGC press release*, headlined "Puerto Rican Alzheimer's Patients to Be First in U.S. to Obtain Cannabis-Based Relief" *on March 26, 2018. It was incorporated three days before the press release was sent out*.

DaMa Pharma says it is "a medical cannabis manufacturing company, and a Clinical Research Organization (CRO) for conducting clinical trials on cannabis-based products" and has a LinkedIn profile, but its website is incomplete. DaMa Pharma's only employee is Stephen Inglis, who is also CEO of a company called InPortal USA.

InPortal is a facilitator, providing "Compliant Market Access through an equity capital markets (ECM) and a debt capital markets (DCM) platform with a dedicated public corporate landing site and controlled investor access to a deal data room."

(Emphasis added.)

131.    The article continued, discussing issues with the Company's alleged German

distribution partner, MediCann:

IGC's German distribution partner was said to be ready to "distribute its formulations in Germany in early 2018," according to a press release from October 2017.

Between Oct. 25, when the press release was issued, and Nov. 3, IGC's Mukunda sold 200,000 shares of IGC stock. There was no further mention in SEC filings of this business partnership and no further press releases.

*Medicann is a German "medical marijuana retailer website," and its listed CEO is Carsten Siegemund. Medicann was created with just 25,000 euros in capital on May 31, 2017.*

*A search of the site finds no mention of the IGC product Hyalolex, which it claims can treat symptoms of Alzheimer's disease.*

*The site itself is a work in progress, since the map shows the center of Central Park in New York, and the answers to FAQ questions are "lorum ipsum" — filler text often used in place of the eventual content of new website templates and other yet-to-be-published materials*.

Cartsten Siegemund helps distribute products for other penny-stock companies besides IGC. One press release touts a 3.7 million euros[ ]distribution agreement, pretty big business for a company started six months earlier with a €25,000 investment.

(Emphasis added.)

132.    The article then discussed how the Company's prior auditor was also the auditor for Longfin Corp., another company that had sought to capitalize on the blockchain frenzy and was subsequently subject to a judicially-imposed asset freeze sought by the SEC. Further, that article reported that Defendant Goel previously worked for the auditor between 2014 and 2016. The article stated, in relevant part:

> On Nov. 8, 2017, the company's shareholders ratified the appointment of AJSH & Co. LLP as IGC's independent registered public accounting firm for the 2018 fiscal year, according to an SEC filing. AJSH had been the company's auditor since 2013.
>
> On March 16, the company suddenly announced it had changed its mind and decided to dismiss AJSH & Co. as its audit firm, with no replacement named. An SEC filing said that "after five years with the same independent public accounting firm, as a matter of good corporate governance, it was appropriate to change to a different firm."
>
> On April 6, the SEC obtained a judge's order to freeze $27 million that it characterized as proceeds from illegal sales of shares of LongFin Corp.[], a brand-new audit client of AJSH & Co. When LongFin went public in December 2017, it was a poster child for shortcut "mini-IPO" rules known as Reg A+, according to an article in Barron's.
>
> There's one additional connection between LongFin's auditor AJSH and IGC.
>
> Rohit Goel, based in Delhi, India, became IGC's principal accounting officer in September 2017, according to the company's website. Goel previously worked for AJSH from April 2014 to August 2016, according to his LinkedIn profile. That profile also states that he has runs BnA Consultancy, an accounting and management consultancy firm, from April 2015 — before he left AJSH — to the present. IGC told the SEC that Goel joined the firm full-time on Sept. 27, 2017, and would serve as a co–principal accounting officer.

133.    The article also revealed that the Company's chief scientific officer, Jagadeesh Rao, had been caught falsifying data in scientific papers, leading to his boss' resignation from running a lab at the National Institutes of Health.

134.    Finally, the article reported that the Company relied heavily on paid stock promoters.

135.     On this news, the price of IGC stock dropped $2.44 per share, or 27.6%, from their closing price on October 3, 2018, to close at $6.41 per share on October 4, 2018.

136.     The price of IGC stock continued to fall the following day, closing at $4.05 on October 5, 2018, representing a 36.8% decline from their closing price on October 4, 2018, and a **54.2% decrease** from their closing price on October 3, 2018.

137.     On October 29, 2018, one day after the MarketWatch article was republished, the NYSE announced that its staff had determined to commence proceedings to delist IGC's stock from the exchange, and trading in IGC stock would be suspended immediately. The NYSE cited the fact that IGC had "substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical" as the impetus for delisting. The NYSE's press release stated, in relevant part:

> NEW YORK, October 29, 2018 – NYSE American LLC ("NYSE American" or the "Exchange") announced today *that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc.* (the "Company") — ticker symbol IGC —*from the Exchange. Trading in the Company's common stock on the NYSE American will be suspended immediately*.

> NYSE Regulation commenced delisting proceedings against the Company pursuant to Section 1003(c) (i) of the NYSE American Company Guide (the "Company Guide") which states that where the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical, it shall not be considered an operating company for the purposes of continued trading and listing on the Exchange.

> *NYSE Regulation also considered Section 1003(f) (iii) because the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest*. Section 1009(a) (ii) of the Company Guide states that it is necessary and appropriate for the protection of investors to immediately suspend trading in the Company's common stock.

The Company has a right to a review of staff's determination to delist the common stock by a committee of the Board of Directors of the Exchange. ***NYSE American will apply to the Securities and Exchange Commission to delist the Company's common stock upon completion of all applicable procedures***, including any appeal by the Company of the NYSE Regulation staff's decision.

(Emphasis added.)

138.    On this news, the price of IGC stock dropped $1.93 per share, or ***77.5%*** from the closing price on October 29, 2018, to close at $0.56 per share on October 30, 2018 after trading on the over-the-counter market that day.

139.    On October 30, 2018, the Company issued a press release, announcing its intent to re-list its securities on an alternative exchange. The press release stated, in relevant part:

BETHESDA, Md.--(BUSINESS WIRE)--India Globalization Capital, Inc. (NYSE American: IGC) announces today that it is ***in the process of evaluating applications with alternative exchanges in the U.S. and Canada to list its common stock for public trading***. IGC is working diligently to complete this process as quickly as possible and will provide additional updates in the very near term. Liquidity, elimination of unfair restrictions with respect to the commercialization of products, and customized support are expected to be key selection points.

"We strongly disagree with the NYSE decision and will seek listing on an exchange that embraces our innovation. We have been transparent in disclosing our active legacy operations and should not be penalized for moving forward to commercialize products in the emerging U.S. cannabis industry. As a publicly traded company with cannabis ambitions, we are under great scrutiny and we intend to navigate the course for all our stakeholders and individuals seeking access to our innovative products including those under development," stated Ram Mukunda, CEO.

(Emphasis added.)

140.    On November 9, 2018, the Company filed a Form 8-K with the SEC, which was accepted for filing after markets closed on November 13, 2018. That filing announced that: "Following the suspension of trading in the Company's common stock on the NYSE AMERICAN Exchange, the Company's shares will trade on the OTC Markets – OTC Pink Tier while the Company follows the procedures to appeal the Exchange's decision."

141.     On this news, the price of IGC stock dropped $0.09 per share, or 8.3% from the closing price on November 13, 2018, to close at $0.99 per share on November 14, 2018.

142.     Before markets opened on November 27, 2018, MarketWatch published another article on IGC, titled "The collapse of this cannabis stock offers a valuable lesson to every investor." The article discussed a number of issues at IGC, including past and present legal proceedings against an IGC staffer and a stock promoter associated with the Company.

143.     Regarding the Company's research and development budget, the MarketWatch article stated, in relevant part:

> while IGC says on its website that it is rigorously studying cannabis, the company has spent only $137,000 in fiscal 2018 on research and development, according to its annual report. It has spent $274,000 in the first two quarters of fiscal 2019, according to another securities filing. In comparison, the average sum for a Phase 2 clinical trial of a treatment for pain is $17 million, according to CenterPoint, which advises on clinical trials.

144.     Regarding Hyalolex's therapeutic potential, the MarketWatch article stated, in relevant part:

> ***health experts have questioned whether a cannabis product can treat symptoms of Alzheimer's***. The American Alzheimer's Association, viewed as an authority on the disease, declined to comment on IGC or Hyalolex. But it says ***there has been very little research on the efficacy of cannabis or any of its ingredients in treating the disease or its symptoms***.

(Emphasis added.)

145.     Regarding the criminal record of one IGC staffer, the MarketWatch article stated, in relevant part:

> Dr. Ranga Krishna, the IGC staffer named as co-inventor of a cannabis-based pain treatment in an IGC patent filing, pleaded guilty to felony tax fraud in 2012. He was sentenced to five years of probation, fined $94,090 and ordered to pay another $47,040 in restitution. A consent order in January 2017 from the West Virginia Board of Medicine shows that Dr. Krishna was reprimanded for failing to disclose the conviction when applying to have his license in that state renewed. That board also fined him.

Krishna did not respond to requests for comment left at his office in Brooklyn. IGC did not respond to questions about him and did not make him available.

146.     Regarding IGC's use of paid stock promoters, the MarketWatch article stated, in relevant part:

> Professional stock promoters have pushed IGC stock to retail investors, who own 85% of the publicly available shares, according to FactSet. One such promoter is SeeThruEquity, which was sued on Nov. 8 by the SEC. In the civil complaint filed in the Federal District Court in Manhattan, the SEC accused SeeThruEquity and its co-founders of defrauding investors by issuing "unbiased" research reports on certain publicly traded company [sic] — including IGC — that were actually paid for by the companies themselves. SeeThruEquity did not respond to requests for comment.

147.     Regarding purported IGC distribution partner MediCann, the MarketWatch article stated, in relevant part:

> ***A search of the site, which is partly under construction, found no mention of Hyalolex***. A page headed "Our Stores" has headings for Oslo, Stockholm, New York, and London, but the page for each of those locations actually shows a map of Central Park. ***Medicann's*** site has no phone number and no email address. Its ***address is listed as Sesame Street***.

(Emphasis added.)

148.     On this news, the price of IGC stock dropped $0.13 per share, or 23.2% from the closing price on November 26, 2018, to close at $0.43 per share on November 27, 2018. This represented a ***96.7%*** decline from the stock's closing price on October 2, 2018, day Citron began tweeting about the Company.

## DAMAGES TO IGC

149.     As a direct and proximate result of the Individual Defendants' conduct, IGC is losing and expending many millions of dollars.

150.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its President and CEO, its Vice President and

PFO, its PAO, and its Board of Directors, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

151.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

152.    Such expenditures include, but are not limited to, the costs of seeking listing on an alternative exchange and/or the costs of defending against delisting from the NYSE.

153.    As a direct and proximate result of the Individual Defendants' conduct, IGC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

154.    Plaintiff brings this action derivatively and for the benefit of IGC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of IGC, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

155.    IGC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.    Plaintiff is, and has been at all relevant times, a shareholder of IGC. Plaintiff will adequately and fairly represent the interests of IGC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

157.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

158.    A pre-suit demand on the Board of IGC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following three individuals: Defendants Mukunda, Prins, and Shenoy (the "Directors"). Plaintiff needs only to allege demand futility as to two of the three directors that were on the Board at the time this action was commenced.

159.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of them engaged in insider sales based on material non-public information, netting proceeds of approximately $523,945, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

160.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

161.    The Directors knew of the falsity of the misleading statements at the time they were made. The statements related to the Company's Alternative Therapies segment and use of blockchain technologies. The Company's Alternative Therapies segment is the core operation of

IGC, as evidenced by the Company's assertion in its 2017-2018 10-K that: "[t]he Company's main focus is to develop and commercialize cannabinoid based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain." This conclusion is further supported by the NYSE's determination to commence delisting proceedings against the Company "pursuant to Section 1003(c) (i) of the NYSE American Company Guide . . . which states that where the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical," as noted in the NYSE's October 29, 2018 press release. Given that the Company's Legacy Infrastructure segment was the business it was engaged in at the time the Company was listed on the NYSE, its Alternative Therapies segment is the Company's core operation. Thus, the Company's cannabis-based therapies are highly material to the Company's core operations.

162.    As Board members of IGC, charged with overseeing the Company's affairs, Defendants Mukunda, Prins and Shenoy all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of IGC, Defendants Mukunda, Prins and Shenoy must have been aware of the material facts surrounding the Company's cannabis-based therapies.

163.    Additional reasons that demand on Defendant Mukunda is futile follow. Defendant Mukunda has served as the Company's President, CEO, Executive Chairman, and member of the Board of Directors since 2005. Thus, as the Company admits, Defendant Mukunda is a non-independent director. IGC provides Defendant Mukunda with his principal occupation, and he receives handsome compensation, including 468,723 in the fiscal year ended March 31, 2018. Defendant Mukunda was ultimately responsible for all of the false and misleading statements and

omissions that were made, including those contained in the foregoing press releases, many of which he personally made statements in, and the foregoing periodic filings with the SEC, each of which he either signed or signed a SOX Certification for. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As the Company's highest officer, Executive Chairman, and Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $510,178 in proceeds, demonstrate his motive in facilitating and participating in the fraud. As stated on the Company's website, Defendant Mukunda "is responsible for the Company's thrust into medical cannabis," and has spent the last four years studying the industry and assembling a team of advisors. Moreover, Defendant Mukunda is a defendant in each of the Securities Class Actions. Defendant Mukunda also benefits from related party transactions with the Company: as stated in the 2018 Proxy Statement, the Company pays an affiliate of Defendant Mukunda "$4,500 per month for office space and certain general and administrative services[] provided in Maryland[,] and $6,100 per month for facilities provided in Washington State." Defendant Mukunda is interested as a result of these payments, which amount to $127,200 per year, or about 27% of his salary for the fiscal year ended March 31, 2018. For these reasons, too, Defendant Mukunda breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Prins is futile follow. Defendant Prins has served as a Company director since 2007, and as Chairman of the Board and Chairman

of the Audit Committee since 2012. He receives handsome compensation, including a 150,000 shares of the Company's stock in the year ended March 31, 2018. As a long-time Company director, Board Chair and Audit Committee Chair, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Prins signed, and thus personally made the false and misleading statements in, the 2017-2018 10-K referenced herein. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. His insider sales before the fraud was exposed, which yielded approximately $13,768 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Prins is a defendant in one of the Securities Class Actions. Thus, for these reasons, too, Defendant Prins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Shenoy is futile follow. Defendant Shenoy has served as a Company director since 2005 and is a member of the Audit Committee. He receives handsome compensation, including a 150,000 shares of the Company's stock in the year ended March 31, 2018. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Shenoy signed, and thus personally made the false and misleading statements in, the 2017-2018 10-K referenced herein. He also solicited the 2018 Proxy Statement,

which contained material misrepresentations and omissions, as alleged above. Moreover, Defendant Shenoy is a defendant in one of the Securities Class Actions. Thus, for these reasons, too, Defendant Shenoy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on the Board is futile follow.

167.    As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Mukunda and Prins received proceeds of approximately \$523,945 as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

168.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, one of whom is named as a defendant in all of the Securities Class Actions and two of whom are named as defendants in one of the Securities Class Actions, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

169.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public,

and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In violation of the Code of Ethics, the Directors failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics, while two of the Directors engaged in insider trading. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

170.    Defendants Prins and Shenoy (together, the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. As a result of the Audit Committee's failures to, among other things, effectively review management's report on the effectiveness of the Company's internal controls over financial reporting and review the Company's compliance and ethics programs, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

171.    IGC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for IGC any part of the damages IGC suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

172.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-

interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

173.    The acts complained of herein constitute violations of fiduciary duties owed by IGC's officers and directors, and these acts are incapable of ratification.

174.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of IGC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of IGC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

175.    If there is no directors' and officers' liability insurance, then the Directors will not cause IGC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

176.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

181.    Under the direction and watch of the Individual Defendants, the 2018 Proxy Statement failed to disclose that: (1) the Company had substantially discontinued the business it was conducting at the time that it was initially listed on the New York Stock Exchange, and was instead engaged in ventures or promotions that had not been developed to a commercial stage or the success of which is problematical; (2) the Company adapted its business model frequently and radically in an attempt to lure investors seeking to capitalize on market fads, such as blockchain and cannabis; (3) the benefits of the Company's relationships with manufacturers, partners, and distributors were overstated in order to create a misleadingly positive impression of IGC's potential commercial success; (4) DaMa Pharmaceutical does not have a long  history of developing premier pharmaceutical products; (5) as a result of the foregoing, IGC's stock would be suspended from the New York Stock Exchange and potentially delisted; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

182.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

183.    Moreover, the 2018 Proxy Statement was false and misleading when it discussed the Company's Code of Ethics, due to the Individual Defendants' failure to abide by the Code of Ethics, including by causing the Company to issue false and misleading statements, as alleged

herein, and three of the Individual Defendants engaging in insider sales of Company stock during the Relevant Period.

184.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of a director and ratification of the selection of an independent auditor.

185.    The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendant Prins, which allowed him to continue breaching his fiduciary duties to IGC.

186.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

187.    Plaintiff on behalf of IGC has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

188.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of IGC's business and affairs.

190.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

191.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of IGC.

192.    In breach of their fiduciary duties owed to IGC, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company had substantially discontinued the business it was conducting at the time that it was initially listed on the New York Stock Exchange, and was instead engaged in ventures or promotions that had not been developed to a commercial stage or the success of which is problematical; (2) the Company adapted its business model frequently and radically in an attempt to lure investors seeking to capitalize on market fads, such as blockchain and cannabis; (3) the benefits of the Company's relationships with manufacturers, partners, and distributors were overstated in order to create a misleadingly positive impression of IGC's potential commercial success; (4) DaMa Pharmaceutical does not have a long history of developing premier pharmaceutical products; (5) as a result of the foregoing, IGC's stock would be suspended from the New York Stock Exchange and potentially delisted; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

193.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

194.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

195.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of IGC's securities and disguising insider sales.

196.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of IGC's securities and engaging in insider sales.

197.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

198.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, IGC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

199.    Plaintiff on behalf of IGC has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, IGC.

202.    The Individual Defendants received bonuses, stock options, or similar compensation from IGC that was tied to the performance or artificially inflated valuation of IGC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

203.    Plaintiff, as a shareholder and a representative of IGC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

204.    Plaintiff on behalf of IGC has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of IGC, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants breached or aided and abetted the breach of their fiduciary duties to IGC;

(c)     Determining and awarding to IGC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing IGC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect IGC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of IGC to nominate at least two candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding IGC restitution from each of the Individual Defendants;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


Dated: November 30, 2018

                               Respectfully submitted,

Of Counsel:

**THE BROWN LAW FIRM, P.C.**           **MURPHY, FALCON & MURPHY**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204                   *-s- Nikoletta S. Mendrinos*
Email: tbrown@thebrownlawfirm.net    Nikoletta S. Mendrinos
                                          Bar No. 18961
                                          One South Street, 23rd Floor
                                          Baltimore, Maryland 21202
                                          Telephone: (410) 539-6500
                                          Facsimile: (410) 539-6599
                                          Email: nikoletta.mendrinos@murphyfalcon.com

                                          *Attorneys for Plaintiff*