IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| In re India Globalization Capital, Inc., Derivative Litigation<br><br>Lead Case No. DKC 18-3698<br>_____<br><br>This Document Relates to: All Cases<br>_____ | Lead Case No. DKC 18-3698<br>Hon. Deborah K. Chasanow |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this shareholder derivative case is Plaintiff's amended consent motion for preliminary approval of derivative settlement. The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion will be granted and the settlement will be approved preliminarily.

**I.   Procedural Background**

On November 30, 2018, Plaintiff Gene Erny, derivatively and on behalf of nominal defendant India Globalization Capital, Inc. ("IGC"), filed a Verified Shareholder Derivative Complaint (ECF No. 1) against individual defendants Ram Mukunda, Claudia Grimaldi, Rohit Goel, Richard Prins, Sudhakar Shenoy, (the "Individual Defendants") and nominal defendant IGC. On February 20, 2019, Plaintiff Waseem Hamden filed a similar complaint against the same defendants. (ECF No. 25). The complaints collectively

alleged violations of Sections 10(b) and 14(a) of the Securities and Exchange Act of 1934, breach of fiduciary duty, unjust enrichment, and corporate waste.  (ECF No. 1, at 61-67; ECF No. 25, at 40-45)[1].

On May 9, 2019, this court consolidated the two cases, with Plaintiff Erny's case being designated as the lead case.  (ECF No. 24).  On June 6, 2019, Plaintiff Dimple Patel filed a Verified Shareholder Complaint against IGC and the Individual Defendants alleging a breach of fiduciary duty by the Individual Defendants.  (ECF No. 31-1, at 4).  On February 13, 2020, plaintiffs Erny, Hamden, and Patel jointly filed their unopposed motion for preliminary approval of derivative settlement.  (ECF No. 29).  On April 30, 2020, after a telephone conference with the court, Plaintiffs filed an amended consent motion.  (ECF No. 31).  The Plaintiffs submit "that after extensive, arm's-length negotiations, the Parties to the Action have agreed to the Settlement, which, if approved, will fully, finally, and forever resolve, discharge, and settle the Released Claims while providing substantial benefits to IGC."  (ECF No. 31-1, at 6).

All three of the Plaintiffs' complaints revolve around much the same conduct: the Individual Defendants' alleged mismanagement of IGC which resulted in material harm to IGC.  Specifically, the

---

[1] References to page numbers in the parties' papers are to the ECF-generated page numbers.

Plaintiffs allege that the Individual Defendants (1) breached their fiduciary duties by failing to maintain internal controls; and (2) made or caused to be made false or misleading statements regarding IGC's business, operations, prospects and legal compliance. (ECF No. 1 ¶¶ 14, 15; ECF No. 25 ¶¶ 14, 15).

## II. The Settlement Process

Plaintiffs describe the process of reaching the parties proposed settlement agreement (the "Settlement Agreement") as follows:

> On June 4, 2019, the parties began discussing a potential mediation to attempt to resolve the claims in all of these derivative actions. Plaintiffs thereafter prepared a detailed set of proposed corporate governance reforms and transmitted them to Defendants. Mediator John R. Van Winkle was retained and an in-person mediation was held on July 31, 2019. The mediation was attended by counsel for the derivative actions and the related securities fraud class action. The derivative Plaintiffs and Defendants, with the help of the Mediator, negotiated the proposed corporate Governance Principles and by the end of the all-day session, had reached an agreement in principal on the scope of the corporate Governance Principles.
>
> Thereafter, the Parties traded drafts and made edits to the suite of corporate Governance Principles and reached an agreement on the exact parameters and language to be used. The Parties also negotiated a written Settlement Agreement and a proposed Order Granting Preliminary Approval to the Settlement, a proposed Notice to the shareholders explaining the proposed settlement, and a Proposed Order Granting Final Approval of the Proposed Settlement. On

3

> January 10, 2020, the Parties finalized the Settlement Agreement and all of the related exhibits and executed the Settlement Agreement.

(ECF No. 31-1, at 9).

### III. The Settlement Agreement

What follows are the material terms of the parties' proposed settlement agreement (the "Settlement Agreement") as designated by Plaintiffs: (1) Board independence, including the appointment of new directors, implementation of a rotating board chair, limitations on directors' ability to serve on other boards, a requirement that the majority of the board be independent, a requirement that directors retain a set amount of equity in IGC, and mandatory board attendance at at least two executive sessions per year; (2) shareholder input with the board and management; (3) changes to IGC's Audit Committee's charter; (4) the creation of a Disclosure Committee; (5) the regular issuance of Executive Reports as to IGC's financial condition and prospects; (6) the adoption of a formal Whistleblower Policy; (7) improvements to the "Related Party Transaction Policy" in the Audit Committee's charter; (8) enhanced Compensation Committee responsibilities; (9) a new Clawback Policy; (10) the development of a director education program; and (11) a new employee compliance training program. (ECF No. 31-1, at 10-20; ECF No. 31-3).

The Settlement Agreement also provides that IGC shall cause the Defendants' insurers to pay Plaintiffs' counsel's attorney's

fees and costs in the amount of $200,000, (the "Fee Award"), which includes a $1,000 payment to each of the Plaintiffs.  Plaintiffs do not, however, seek preliminary approval of the fee award.  Rather, Plaintiffs seek (1) preliminary approval of the Settlement Agreement independent of the Fee Award, (2) approval of Plaintiffs' form of Notice, and the publication of the Notice as contemplated by the Settlement Agreement, and (3) the scheduling of a hearing to entertain any comments or objections to final approval of the Settlement Agreement and to consider the application of Plaintiffs' counsel for an award of attorneys' fees and expenses, as well as service awards to Plaintiffs.  (ECF No. 31-1, at 6-7).

**IV. Analysis**

Federal Rule of Civil Procedure 23.1 provides that a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval.  Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed.R.Civ.P. 23.1(c).  At the preliminary approval stage, the court assesses the proposed settlement to determine "whether there has been a basic showing that the Proposed Settlement Agreement 'is sufficiently within the range of reasonableness so that notice . . . should be given.' *In re Lupron Marketing and Sales Practices Litigation*, 345 F.Supp.2d 135, 139 (D.Mass. 2004)." *In re Am.*

*Capital S'holder Derivative Litig.*, No. CIV. 11-2424 PJM, 2013 WL 3322294, at *3 (D. Md. June 28, 2013).

Ultimately, in determining whether to approve a settlement pursuant to Rule 23.1, "[t]he essential inquiry is whether the proposed settlement is fair, adequate, and reasonable." *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983) (citing *In Re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 207 (5th Cir.1981); *In Re Beef Industry Antitrust Litigation*, 607 F.2d 167, 179–80 (5th Cir. 1979); *In re Montgomery County Real Estate Antitrust Litigation*, 83 F.R.D. 305, 315 (D. Md. 1979); Manual for Complex Litigation § 1.46 at 56–57 (5th Ed.1982).

**A.  Fairness**

In assessing the fairness of a proposed settlement, "the purpose of the inquiry is to protect against the danger of counsel – who are commonly repeat players in larger-scale litigation – from 'compromising a suit for an inadequate amount for the sake of insuring a fee.'"  *In re Am. Capital*, 2013 WL 3322294, at *3 (quoting *In re Mid–Atlantic Toyota Antitrust Litig.*, 564 F.Supp. at 1385).  In so doing, courts must determine:

> that the settlement was reached as a result of good-faith bargaining at arm's length, without collusion, on the basis of (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of

6

>counsel in the area of securities class action litigation.

*In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991) (citing *In re Montgomery County Real Estate Antitrust Litigation*, 83 F.R.D. 305 (D.Md.1979)).

In this case, the court is satisfied, at this stage, that the parties bargained at arms-length and without collusion. While this case is settling "at a very early stage in the litigation and prior to any formal discovery, raising questions of possible collusion among the settling parties. . . any inference of collusion [is] offset by other factors[.]" *Id*. at 159. Mainly, IGC will benefit from the "substantial corporate governance enhancements" envisioned in the Settlement Agreement. (ECF No. 31-1, at 23-24).

"[I]n derivative actions where the harm done is to the corporation, a monetary benefit is not necessary for settlement approval." *In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F.Supp.3d 277, 280 (S.D.N.Y. 2015) (citing *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 395, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit ... regardless of whether the benefit is pecuniary in nature.")) Such non-monetary benefits may come in the form of "significant corporate governance reforms." *Id*. The changes to IGC's corporate governance envisioned in the Settlement

7

Agreement are not just "significant," but also "topical response[s] to the allegations in the Complaint[s]." *American*, 2013 WL 3322294, at *4. Plaintiffs summarize those allegations as follows:

> (1) the Company had substantially discontinued the business it was conducting at the time that it was initially listed on the New York Stock Exchange, and was instead engaged in ventures or promotions that had not been developed to a commercial stage or the success of which is problematical; (2) the Company adapted its business model frequently and radically in an attempt to lure investors seeking to capitalize on market fads, such as blockchain and cannabis; (3) the benefits of the Company's relationships with manufacturers, partners, and distributors were overstated in order to create a misleadingly positive impression of IGC's potential commercial success; (4) DaMa Pharmaceutical does not have a long history of developing premier pharmaceutical products; (5) as a result of the foregoing, IGC's stock would be suspended from the New York Stock Exchange and potentially delisted; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

(ECF No. 1, at 5-6). As detailed in the complaints, the Individual Defendants comprised the entirety of IGC's board of directors and none of them were independent. The Settlement Agreement remedies the problem of board independence. In addition, the bulk of Plaintiffs' complaints stem from failures of disclosure; these failures in turn led to the propagation of misleading information regarding IGC. The corporate governance enhancements discussed

8

above significantly bolster IGC's obligations to disclose pertinent information to shareholders. The Settlement Agreement reforms also provide for a stronger Audit Committee, a formal whistleblower policy, and the requirement of accepting shareholder input, all of which are well-targeted fail-safes to the enhanced disclosure requirements. These reforms should go a long way in preventing the kinds of missteps which Plaintiffs allege to have constituted breaches of fiduciary duties.

The court is also preliminarily satisfied with the experience of Plaintiffs' counsel. In addition to the impressive resumes of named counsel in this case, both firms have extensive experience in shareholder derivative litigation. Finally, "[t]he Proposed Settlement was the product of extensive formal mediation aided by a neutral . . . mediator, hallmarks of a non-collusive, arm's-length settlement process." *Fab Universal*, 148 F.Supp.3d at 280.

**B.  Adequacy**

In determining the adequacy of the proposed Settlement, the Court must weigh the following factors: (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated

judgment; and (5) the degree of opposition to the settlement. *Montgomery*, 83 F.R.D. at 316.

Without the benefit of a motion to dismiss – or even an answer to Plaintiffs' complaints – the court is left to analyze the first three factors based on the complaints alone. However, the Court is not permitted to "decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981). Further, even if this settlement had come at a later stage and the court had more information with which to assess Plaintiffs' claims, "shareholder derivative litigation is notoriously difficult and unpredictable [and therefore] settlements are favored." *Republic Nat. Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y.1977) (citations omitted). "The doctrine of demand futility, the business judgment rule, and the generally uncertain prospect of establishing a breach of fiduciary duties combine to make shareholder derivative suits an infamously uphill battle for plaintiffs." *Fab Universal*, 148 F.Supp.3d at 281-82. Given the certainty of the benefits of settlement relative to extended, costly, and unpredictable litigation, the first three factors weigh generally in favor of preliminary approval.

The Plaintiffs' motion does not address the fourth factor. As to the fifth, the Plaintiffs propose – and precedent dictates – that "notice of the proposed settlement . . . be provided to shareholders and a date set for a final hearing to consider final

settlement approval." (ECF No. 31-1, at 16). At such a final hearing, objections from other shareholders may well arise, but at this stage, the Settlement Agreement faces no opposition. All told, the court is satisfied that the Settlement Agreement is "at least within the range of what can be deemed reasonable and adequate." *American*, 2013 WL 3322294, at *4 (citing *In re Mid-Atlantic Toyota Antitrust Litigation*, 564 F.Supp. at 1385).

## V.   Notice

"Notice of a proposed settlement ... must be given to shareholders or members in the manner that the court orders." F.R.C.P. 23.1(c)." Here, the Settlement Agreement provides that "IGC shall cause a copy of the Notice: (a) to be filed with the SEC on Form 8-K; (b) to be published in a press release; and (c) to be posted, together with this Agreement and its incorporated exhibits, in the 'Investors' section on IGC's website, which posting shall remain on IGC's website through the Hearing Date." (ECF No. 31-3, ¶ 3). The court directs that, in addition to the proposed forms of notice, Plaintiffs shall also cause notice of the proposed settlement to be published in *Investor's Business Daily*. *See*, *Fab Universal*, 148 F.Supp.3d at 282, *American*, 2013 WL 3322294, at *2. *See also*, *In re The Cheesecake Factory Inc. Derivative Litig.*, No. CV-06-6234 ABC(MANx), slip op. (C.D. Cal. Mar. 7, 2008) (finding publication of notice of the settlement in

11

Investor's Business Daily met the requirements of RCP 23.1 and due process).

**VI. Conclusion**

For the foregoing reasons, the motion for preliminary approval of derivative settlement filed by Plaintiffs will be granted. A separate order will follow.

/s/<br>
DEBORAH K. CHASANOW<br>
United States District Judge